**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CAROL ANNE BECKER,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.   20-cv-5806** |
| | : | |
| **KILOLO KIJAKAZI,[1]** | : | |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

<u>**MEMORANDUM OPINION**</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                    **April 14, 2022**

Plaintiff Carol Anne Becker brought this action seeking review of the Commissioner of Social Security Administration's decision denying her claim for Social Security Disability Insurance (SSDI) benefits and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–433, 1381–1383f.  This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 13) is **DENIED**.

**I.      PROCEDURAL HISTORY**

Plaintiff protectively filed for SSDI and SSI, alleging disability since January 13, 2018, due to fibromyalgia, anxiety, depression, high blood pressure, insomnia and fatigue.  (R. 162-187, 211, 214).  Plaintiff's applications were denied at the initial level, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R. 90-101).  Plaintiff, represented by

---

[1]  Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration on July 9, 2021.  Pursuant to Federal Rule of Civil Procedure 25(d), I have substituted her as the defendant in this lawsuit.

counsel, and a vocational expert (VE) testified at the August 23, 2019 administrative hearing. (R. 33-54).  On September 24, 2019, the ALJ issued a decision unfavorable to Plaintiff.  (R. 12-32).  Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review on September 22, 2020, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  (R. 1-6).

On November 19, 2020, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania.  (Compl., ECF No. 1).  On December 28, 2020, Plaintiff consented to my jurisdiction pursuant to 28 U.S.C. § 636(C). (Consent Order, ECF No. 5).  On June 23, 2021, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review. (Pl.'s Br., ECF No. 13).  On August 23, 2021, the Commissioner filed a Response.  (Resp., ECF No. 16).

## II.    FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on August 9, 1966, and was 51 years old on the alleged disability onset date.  (R. 27).  She graduated from high school.  (R. 27, 215).  Plaintiff previously worked as a cashier in a convenience store and a dietary aide in a nursing home.  (R. 26-27, 215).

### A.    Medical Evidence[2]

During the relevant time period, Plaintiff treated for fibromyalgia, anxiety and depression with her primary care provider, Joseph Strangarity, M.D.  (R. 268-311, 336-375).  On January

---

[2] Plaintiff's Request for Review does not concern the ALJ's findings regarding her high blood pressure and obesity.  Accordingly, the Court will not address these issues at this time.

18, 2018, Plaintiff visited Dr. Strangarity to renew her prescriptions and for right ankle pain with swelling if she stood too long, with an onset two weeks earlier.  (R. 271-72).  The notes from this visit indicate that she had been diagnosed with fibromyalgia and that she had been prescribed Norco and Trazodone.  (R. 269-70, 304-05; *see also* Pl.'s Br., ECF No. 16, at 2 n.8).  She returned to Dr. Strangarity on April 17, 2018, and reported that she had pain "all over," that the pain was an "8" on a scale of 10, that it was worst when working (but that she had been "let go" from her job in January), and that she could not stand or sit for more than 30 minutes at a time. (R. 307).  The notes from this visit include additional diagnoses for depression and anxiety.  (R. 306-07).  During this visit, Plaintiff was alert, oriented and cooperative, although her mood and affect at the earlier visit were described as appropriate but depressed, labile, sad and tearful.  (R. 307).

Plaintiff visited Dr. Strangarity again on May 15, 2018, at which time he completed Psychiatric/Psychological Impairment and Fibromyalgia Questionnaires. (R. 258-267, 269).  The first questionnaire indicates diagnoses for depression and anxiety, a prescription for Prozac and Clonazepam, hospitalization for psychiatric symptoms 35 years ago, an expectation that Plaintiff's current symptoms would last more than 12 months and that she was not a malingerer. (R. 258).  Dr. Strangarity also identified the following symptoms: depressed mood; persistent or generalized anxiety; blunt, constricted, irritable, flat, labile and inappropriate affect; feelings of guilt or worthlessness; hostility or irritability; a past suicide attempt; difficulty thinking or concentrating; easy distractability; poor immediate, recent or remote memory; intrusive recollections of traumatic experience; paranoia/suspiciousness; persistent irrational fears; recurrent panic attacks; anhedonia/pervasive loss of interests; appetite disturbances/weight change; decreased energy; pathological dependence, passivity or aggressiveness; agitation;

speech abnormalities; social withdrawal or isolation; disorientation to time and/or place; and excessive sleep.  (R. 259).  He indicated that Plaintiff's most frequent and/or severe symptoms were her depression and isolation.  (R. 260).  He recorded that Plaintiff did not have a low IQ or reduced intellectual functioning.  (*Id.*).  He found that Plaintiff's psychiatric conditions exacerbated her pain and physical symptoms and that she experienced episodes of decompensation or deterioration in work-like settings, which would cause her to withdraw from the situation or exacerbate her symptoms, because she could not deal with stress or make quick decisions.  (*Id.*).

Dr. Strangarity also checked boxes on the questionnaire indicating Plaintiff's limitations in different areas.  (R. 261).  He rated her limitations as follows: moderate-to-marked regarding understanding and memory; generally moderate or marked regarding her concentration and persistence, depending on the precise ability at issue; generally moderate-to-marked regarding her social interactions; and generally marked regarding her adaptation.  (R. 261).  He indicated that Plaintiff had no limitations not set forth in the questionnaire.  (R. 262).  He predicted that her impairments or treatment thereof would cause her to miss work more than three times per month. (R. 262).  He opined that Plaintiff's symptoms and limitations persisted since January 13, 2018, and that they were reasonably consistent with available clinical and objective findings.  (*Id.*).

The Fibromyalgia Questionnaire completed by Dr. Strangarity indicated that Plaintiff met the clinical criteria for a fibromyalgia diagnosis and that no other diagnosis better explained her symptoms and limitations.  (R. 263).  As in the prior questionnaire, he concluded that her current symptoms would last more than 12 months, that she was not a malingerer and that Plaintiff's psychiatric conditions exacerbated her pain and physical symptoms.  (*Id.*).  He checked boxes indicating Plaintiff had widespread constant pain, fluctuating in intensity and aggravated by cold,

with at least 11 tender spots upon physical examination.  (R. 264-65).  Additional related symptoms included fibro fog, poor memory, fatigue/tiredness, insomnia, depression, nervousness, blurred vision, dry eyes, ringing in ears, hair loss, itching, bladder spasms, headache, heartburn, loss of appetite, muscle weakness, nausea/vomiting, numbness/tingling, shortness of breath and sun sensitivity.  (R. 264).  Dr. Strangarity indicated that Plaintiff must avoid all activities.  (R. 265).  He found that Plaintiff could perform a seated job or a standing/walking job for less than one hour each per day and that Plaintiff would have to get up for 30 minutes every 15 minutes.  (R. 266).  He indicated that she could occasionally lift or carry up to five pounds but never more than that.  (*Id.*).  He further indicated that she had significant limitations in reaching, handling and fingering, such that she could occasionally perform these activities with her right hand but never with her left one or if she had to reach overhead with either hand.  (*Id.*).  Dr. Strangarity predicted that Plaintiff's symptoms would worsen if she were placed in a competitive work environment, that she would frequently experience severe symptoms interfering with her attention and concentration and requiring her to take unscheduled 30-minute breaks every 15 minutes.  (*Id.*).

Plaintiff also visited Dr. Strangarity on November 14, 2018; April 15, 2019; and August 6, 2019.  (R. 309-10, 352-56, 369-70, 372-75).  During the November 2018 visit, Plaintiff was alert, oriented and cooperative.  (R. 353).  The notes from the August 2019 visit indicate that Plaintiff was able to walk with a walker but reported pain lasting the whole day in her back, legs, shoulders and ankles, with minimal relief from pain medication.  (R. 370).  Dr. Strangarity also completed a Multiple Impairment Questionnaire at this visit.  (R. 362-66).  The findings in this questionnaire largely repeat those in the two earlier questionnaires completed by Dr. Strangarity, except that now he indicated that Plaintiff could also not use her right hand for reaching,

handling and fingering and that she would require unscheduled 15-minute breaks every 30 minutes.  (R. 365).  In addition, he indicated that while sitting Plaintiff needed to elevate both legs to the level of her chest or higher as frequently and for as long as possible, and that Plaintiff would have good and bad days.  (R. 364, 366).

On September 26, 2018, Ahmed Kneifati, M.D., conducted an internal medicine examination of Plaintiff.  (R. 321-35).  She reported insomnia for the last ten years for which she was taking medication, and fibromyalgia for the last 18 years with fatigue, a burning feeling, and pain upon any touching of her body.  (R. 321).  She described her pain as a "6" on a scale of 10 – but worse when sitting too long, bending, lifting, walking distances or reaching overhead or when the temperature or humidity changes – and mostly in her cervical, lumbar, shoulder, hip, knee and ankle joints.  (*Id.*).  Dr. Kneifati noted that Plaintiff had a bilateral antalgic gait, could only squat 30 percent, and was unable to balance or walk on her toes or heels, but also that she was in no acute distress, had a normal stance, did not use any assistive devices, needed no assistance getting on or off the examination table, and could rise from the chair without difficulty.  (R. 323).  Her skin, lymph nodes, head, face, eyes, ears, nose, throat, neck, chest, lungs, abdomen and extremities were all normal.  (*Id.*).  Dr. Kneifati recorded that Plaintiff had stable joints with no evident deformity, however, she indicated tenderness in 18 spots on her body, including her cervical, upper thoracic, and lumber areas, and elbows, hips, knees, ankles and anterior neck.  (R. 324).  She demonstrated hand and finger dexterity and full strength in her extremities and grip.  (*Id.*).  She was also able to fill out a form, tie laces and manipulate zippers and buttons.  (*Id.*).  Dr. Kneifati concluded that her overall prognosis was fair.  (*Id.*).

Dr. Kneifati also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical).  (R. 326-31).  He found that Plaintiff could occasionally lift and carry up to

10 pounds but never more than that; occasionally reach overhead, balance, stoop, kneel, crouch and climb stairs, ramps, ladders and scaffolds; occasionally tolerate exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, and extreme hot and cold; frequently reach everywhere except overhead and handle, finger, feel, push, pull, operate bilateral foot controls and crawl; continuously tolerate exposure to vibrations, dust, odors, fumes and pulmonary irritants; sit for two hours and stand and walk for one hour without interruption; and tolerate loud noise.  (*Id.*).  He further found that none of Plaintiff's impairments affected her vision or hearing, that she did not need a wheelchair, walker, crutches or cane to ambulate, and that she could not walk at a reasonable pace on a rough or uneven surface but that she could shop, travel alone, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal, feed herself, care for her personal hygiene, and sort, handle, and use paper and files.  (R. 327, 331).  Lastly, he observed that Plaintiff had normal range of motion for her wrists, hands, thumbs, elbows, and hips, but less than full range for her shoulders, knees, neck, spine and ankles.  (R. 332-35).

Also on September 26, 2018, Stacy Trogner, PsyD, conducted a mental status evaluation of Plaintiff.  (R. 312-17).  Plaintiff told Dr. Trogner that she had worked as a customer service representative for 14 years until January 2018 when she became unable to work due to physical limitations, depression, anxiety and panic attacks.  (R. 312).  However, she also indicated that she was not receiving mental health treatment and that her primary care physician manages her medication.  (*Id.*).  In addition, she reported difficulty falling and staying asleep, loss of appetite (but without weight loss), dysphoric moods, crying spells, fatigue, social withdrawal, loss of interest and motivation, wanting to be left alone, increased depression over her physical pain, a hyperstartle response, hypervigilance, shaking, chest pain, hot and cold flashes, hearing

difficulties, breathing difficulties when things are disordered or she must leave her home, short-term memory deficits and inability to make decisions.  (R. 313-14).  Further, Plaintiff claimed to see shadows and people and to hear sounds in her home without knowing if anyone is really there.  (R. 314).  She denied hearing voices, homicidal or suicidal ideation, excessive apprehension, worrying every day, or manic symptoms.  (*Id.*).  Plaintiff was able to count down by threes from 20, but made a mistake on the third number in the sequence when counting down by sevens[3] from 100, and was able to state four digits correctly forward and backward.  (R. 315).  She could remember three objects immediately but only one of three after a five-minute delay.  (*Id.*).

Plaintiff reported that she was able to dress, bathe if someone is home, groom herself, cook once per week, clean, manage her money, watch television and play on her iPad.  (R. 316).  She stated that she has a driver's license.  (*Id.*).  She reported that her husband does the laundry and that he and others shop for her and assist her with daily living activities.  (*Id.*)

Dr. Trogner recorded that Plaintiff related to others in a fair manner; had appropriate posture and eye contact; dressed neatly; spoke fluently and clearly; was cooperative but tearful, depressed and anxious; demonstrated coherent and goal directed thought processes with no evidence of hallucinations, delusions or paranoia; displayed mildly impaired attention, concentration and memory skills due to emotional distress secondary to her psychiatric issues; appeared to possess low average cognitive functioning with a fund of information appropriate to her experience; and showed fair insight and judgment.  (R. 315).  Dr. Trogner diagnosed Plaintiff

---

[3]  Dr. Kneifati's notes indicate that Plaintiff was also counting down from 100 by threes, but as the Commissioner suggests, this appears to be a typographical error, particularly since the numbers given by Plaintiff were all seven less than the preceding number, with one error.  (Resp., ECF No. 16, at 7; *see also* R. 315).

with major depressive disorder (recurrent, moderate), generalized anxiety disorder, panic disorder and posttraumatic stress disorder and recommended medical follow up as needed, individual psychological therapy, and psychiatric intervention.  (R. 316).  She concluded that Plaintiff's prognosis was fair to guarded in light of her symptoms and lack of mental health treatment.  (*Id.*).

Dr. Trogner also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental).  (R. 318-20).  She found that Plaintiff had mild limitations in understanding, remembering and carrying out simple instructions and in her ability to make judgments on simple work-related decisions; moderate limitations in understanding, remembering and carrying out complex instructions and in her ability to make judgments on complex work-related decisions; and marked limitations in her ability to interact appropriately with the public, supervisors and coworkers and to respond appropriately to usual work situations and to changes in a routine work setting.  (R. 318-19).

On October 9, 2018, Lisa Cannon, PsyD, completed a Disability Determination Explanation regarding Plaintiff.  (R. 55-85).  She found that Plaintiff had a mild limitation regarding understanding, remembering or applying information and a moderate limitation in interacting with others, adapting or managing herself, and concentrating, persisting or maintaining pace.  (R. 61).  She concluded that Plaintiff could mentally perform basic tasks on a sustained basis, including understanding, retaining and following up to two-step instructions.  (*Id.*).  Dr. Cannon noted that although Plaintiff claimed to have severe concentration and memory problems, her examination showed only mild impairment.  (*Id.*).  She recorded that Plaintiff's impairments could reasonably be expected to produce her symptoms but that her statements about their intensity, persistence and functionally limiting effects were not

substantiated by the objective medical evidence alone.  (R. 62).  In the Mental Residual

Functional Capacity Assessment portion of the document, she indicated that Plaintiff did not

have understanding and memory limitations and was not significantly limited in carrying out

simple or detailed instructions; sustaining an ordinary routine without special supervision;

working with or near others without distracting or being distracted by them or exhibiting

behavioral extremes; making simple work-related decisions; requesting assistance, maintaining

socially appropriate behavior and adhering to basic standards of neatness and cleanliness; being

aware of normal hazards and taking appropriate precautions; and setting realistic goals or making

plans independent of others.  (R. 65-66).  However, Plaintiff had moderate limitations in

concentrating for extended periods; performing activities within a schedule, maintaining regular

attendance and being punctual; completing a normal workday or workweek without interruptions

from psychological symptoms and performing at a consistent pace without unreasonable rest

periods; interacting appropriately with the general public; accepting instructions and responding

appropriately to criticism from supervisors; responding appropriately to changes in the

workplace; and traveling in unfamiliar places or using public transportation.  (*Id.*).

On October 15, 2018, Ruth Arnold, D.O., completed the medical portion of Plaintiff's

Disability Determination Explanation.  (R. 55-85).  Dr. Arnold indicated in the Physical Residual

Functional Capacity Assessment portion of the document that Plaintiff could sit or stand/walk for

six hours per day; lift, carry, push and pull 10 pounds frequently and 20 pounds occasionally;

occasionally stoop and climb ramps, stairs, ladders, ropes, and scaffolds; frequently balance; and

kneel, crouch and crawl without limitations.  (R. 63-64).  She found that Plaintiff had no

manipulative, visual, communicative or environmental limitations.  (R. 64).  She concluded that

in light of her impairments Plaintiff could perform light, unskilled duties.  (R. 68).

**B.** **Non-Medical Evidence**

The record also contains non-medical evidence.  In an Adult Function Report dated August 15, 2018, Plaintiff noted that she has constant pain throughout her body; cannot sit or stand for extended periods; cannot lift or carry anything over five pounds, has chronic fatigue, anxiety and depression; and finds it difficult to concentrate or understand.  (R. 227).  She described spending her days sitting, walking, making sandwiches, showering if her husband is home, and feeding her cats.  (R. 228).  She reported difficulty sleeping due to pain and needing help dressing, bathing and washing dishes but that she was able to manage hair care, shaving, feeding herself, using the toilet, dusting, managing money and preparing simple meals once per week.  (R. 228-29, 231).  She stated that she no longer drives and that her husband does the shopping.  (R. 230).  Plaintiff indicated that she receives visitors, attends medical appointments and dines in a restaurant once per week.  (R. 231).  She reported difficulties or the inability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, remember things, complete tasks, concentrate, understand, or follow instructions.  (R. 232).  She maintained that she gets along well with authority figures, but that she is jumpy and does not handle stress or changes in routine well.  (R. 233).  She also checked a box indicating that she uses a cane.  (*Id.*).

In the attached Supplemental Function Questionnaire, Plaintiff indicated that she experiences fatigue all day long and that nothing helps it.  (R. 235).  She described feeling an aching, stabbing, constant pain throughout her body that worsens with activity or walking.  (R. 236).  She questioned whether the pain had worsened or if it had just become harder to cope with it.  (*Id.*).  She stated that her medication "takes [the] edge off" the pain for four hours but "never gets rid of it."  (R. 237).  She indicated utilizing joint wraps and rest for pain but denied using other treatments.  (*Id.*).

At the August 23, 2019 administrative hearing, Plaintiff testified that she completed high school, has a driver's license and lives with her husband and adult stepson. (R. 39-40).  She stated that she has constant pain throughout her body, made worse by standing or sitting, which she can only do for 30 minutes at a time.  (R. 41).  She indicated that her medications "take the edge off" her pain.  (*Id.*).  She denied receiving any other treatment.  (R. 42).  She reported crying frequently, not wanting to get out of bed, increased sleep, not wanting to talk to or see anyone, waking in the middle of the night at times with pain, and daily panic attacks.  (R. 42-44). Plaintiff testified that she could stand for up to 30 minutes or walk one block with her walker but would not try to walk without it due to frequent falls.  (R. 44-45).  She maintained that her husband, stepson and daughter-in-law care for her and handle all household chores, although she does go shopping with her daughter-in-law.  (R. 45).  According to Plaintiff, she spends her days on her iPad and watching television but sometimes "zones out."  (R. 45, 47).  During this time, she has her legs elevated for approximately two hours per day.  (R. 48).

## III.    ALJ'S DECISION

Following the administrative hearing held on August 23, 2019, the ALJ issued a decision in which he made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.    The claimant has not engaged in substantial gainful activity since January 13, 2018, the alleged onset date.

3.    The claimant has the following severe impairments: obesity, fibromyalgia, depression and anxiety.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is capable of occasional climbing of stairs and ramps, balancing, stooping, kneeling, crouching, or crawling, but never climbing of ladders, rope or scaffolds.  The claimant has retained the mental capacity to tolerate occasional interaction with the public and no piece rate type of work.  The claimant is limited to simple routine repetitive tasks with a GED of 111.

6.    The claimant is unable to perform any past relevant work.

7.    The claimant was born on August 9, 1966, and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.

8.    The claimant has at least a high school education and is able to communicate in English.

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.   The claimant has not been under a disability, as defined in the Social Security

Act, from January 13, 2018, through the date of this decision.

(R. 15-28).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 28).


IV.   **LEGAL STANDARD**

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If she is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform her past work.  If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four.  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, she is able to perform substantial gainful activities in jobs existing in the national economy.  *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88,

92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited.  A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it.  *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The court has plenary review of legal issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.        DISCUSSION

In her request for review, Plaintiff raises two claims: (1) the ALJ failed to evaluate properly the medical evidence in determining Plaintiff's residual functional capacity (RFC); and (2) the ALJ failed to evaluate properly Plaintiff's subjective statements.  (Pl.'s Br., ECF No. 13, at 2-18).

### A.        Medical Evidence

#### 1.        Fibromyalgia

Plaintiff argues that the ALJ's decision disregards Dr. Strangarity's explanation of her physical impairments, as substantiated by evidence of her fibromyalgia, in violation of 20 C.F.R. Sections 404.1520c and 416.920c.[4]  (Pl.'s Br., ECF No. 13, at 4).  She contends that the decision

---

[4]  These sections set forth how the Social Security Administration (Administration) "consider[s] and articulate[s] medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017."  20 C.F.R. § 404.1520c (SSDI claims); *id.* § 416.920c

betrays a fundamental misunderstanding of the disease, which can only be documented through subjective evidence and for which surgery is never recommended.  (*Id.*).  She claims that the ALJ improperly discounted Dr. Strangarity's opinions regarding her impairments because they were allegedly inconsistent with treatment records that did not document her diminished strength and reflexes or assess her RFC, and because Dr. Strangarity is not a specialist, even though 20 C.F.R. Sections 404.1520c and 416.920c no longer treat a physician's specialty as significant in the evaluation of a medical opinion's persuasiveness.  (*Id.* at 6-7).  According to Plaintiff, the ALJ also erred in concluding that the physical limitations Dr. Strangarity described conflict with evidence that Plaintiff can perform some activities of daily living (ADLs).  (*Id.* at 7).  In sum, Plaintiff maintains that the ALJ failed to articulate how he considered the factors of consistency and supportability, as well as the length, frequency, and nature of Dr. Strangarity's treatment of Plaintiff, in assessing the persuasiveness of his opinions.  (*Id.* at 7-8 (citing 20 C.F.R. §§ 404.1520c, 416.920c)).

Similarly, Plaintiff alleges that the ALJ rejected the consistent opinions of Dr. Kneifati, the Commissioner's examining physician, regarding Plaintiff's ability to sit, stand and walk for the same reasons he rejected those of Dr. Strangarity, even though Dr. Kneifati is a specialist familiar with the rules for establishing disability.  (*Id.* at 9).  Plaintiff asserts that the ALJ, without explanation, instead credited the opinion of Dr. Arnold, a non-examining, non-specialist medical consultant who reviewed only a portion of the medical file, despite the fact that,

---

(SSI claims).  To determine how persuasive a medical opinion is under these sections, the Administration evaluates its supportability and consistency – the two most important factors – as well as the relationship between the source and the claimant, any relevant specialization of the source, and other facts, such as any familiarity of the source with other evidence in the claim or with the policies and evidentiary requirements of the disability program.  *Id.* §§ 404.1520c(a), (b)(2), (c)(1)-(5), 416.920c(a), (b)(2), (c)(1)-(5).

standing alone, her opinion is not substantial evidence insofar as it conflicts with the well-supported opinion of the treating doctor, Dr. Strangarity.  (*Id.* at 9-10 (citations omitted)).

The Commissioner responds that the ALJ properly rejected the physical limitations checked off by Dr. Strangarity on the questionnaires because the progress notes purportedly substantiating these limitations were largely based upon Plaintiff's subjective complaints rather than the necessary thorough examination.  (Resp., ECF No. 16, at 8).  Although the Commissioner acknowledges that the symptoms of fibromyalgia are subjective, she asserts that the ALJ may nonetheless reject such subjective complaints where they are not supported by the objective evidence.  (*Id.* at 8 & n.5).  Further, she contends that the ALJ correctly concluded that Dr. Strangarity's opinion was inconsistent with Plaintiff's ADLs and with her limited, conservative treatment of pain medication and infrequent visits to a non-specialist only.  (*Id.* at 9).  She also disputes that the limitations found by Dr. Kneifati were consistent in degree with those found by Dr. Strangarity.  (*Id.* at 8).  Lastly, she observes that the ALJ reasonably found Dr. Arnold's opinion persuasive because it coincided with the evidence in the record as a whole. (*Id.*).

An RFC assessment determines "what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of [his] medically determinable impairment(s)."  SSR 83-10, 1983 WL 31251, at *7 (1983).  The ALJ must include all credibly established limitations in the RFC.  *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)).  Ultimately, the ALJ makes the RFC and disability determinations.  *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).  However, an ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence.  *Cotter v.*

17

*Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

Here, the ALJ found that Plaintiff, physically, had the RFC to perform light work with occasional climbing of stairs and ramps, balancing, stooping, kneeling, crouching, or crawling, but without climbing of ladders, ropes, or scaffolds. (R. 20) In making this finding, he rejected Dr. Strangarity's opinion that Plaintiff had greater limitations for the following reasons: her history of conservative treatment, her self-reported ADLs, the fact that Dr. Strangarity did not assess her functional abilities in relation to her impairments, the lack of documentation of her need for a walker and the results of her consultative examination. (*Id.*) For similar reasons, he also found only partially persuasive Dr. Kneifati's opinion that Plaintiff had more significant limitations than were consistent with the RFC he had determined (although the limitations were less significant than those determined by Dr. Strangarity). (R. 25) Specifically, the ALJ agreed with Dr. Kneifati that Plaintiff could engage in the type of movements set forth in the RFC but rejected the exertional, environmental and sit/walk/stand limitations determined by Dr. Kneifati. (*Id.*).

Substantial evidence supports the ALJ's determination regarding the physical aspects of Plaintiff's RFC. Plaintiff claims that the ALJ disregarded the fact that Dr. Strangarity's opinions were based upon her complaints of "sharp, constant, widespread pain in multiple joints that worsened with stress, heat, and cold." (Pl.'s Br., ECF No. 13, at 4) However, "a claimant who has been diagnosed with fibromyalgia will not automatically be classified disabled under the Social Security Act." *Osborne v. Berryhill*, No. 16-96, 2017 WL 818846, at *3 (W.D. Pa. Mar. 2, 2017) (citation omitted). "Even in fibromyalgia cases, the ALJ must compare the objective evidence and the subjective complaints and is permitted to reject plaintiff's subjective testimony so long as he provides a sufficient explanation for doing so." *Id.* (quoting *Nocks v. Astrue*, 626

18

F. Supp. 2d 431, 446 (D. Del. 2009)).  Here, the ALJ explained that, notwithstanding Plaintiff's

subjective complaints and Dr. Strangarity's opinions based upon them, the objective evidence in

the record did not support the limitations determined by Dr. Strangarity.  (R. 26)  For example,

as the ALJ observed, the comprehensive consultative examination performed by Dr. Kneifati

revealed that Plaintiff had full grip strength in each hand, full strength and normal reflexes in her

arms and legs, and normal skin, head, face, ears, nose, throat, neck, chest, lungs, and abdomen.

(R. 26, 324).  In addition, she had stable joints without evident deformity and normal range of

motion for her wrists, hands, thumbs, elbows, and hips.  (R. 332-35).  She needed no assistance

getting on or off the examination table, could rise from the chair without difficulty, and did not

use any assistive devices (consistent with her lack of documentation demonstrating a medical

need for any).  (R. 26, 323).  She was also able to fill out a form, tie laces and manipulate zippers

and buttons.  (*Id.*).  These examination results constitute substantial evidence supporting the

ALJ's rejection of Dr. Strangarity's inconsistent opinions, as well as of Dr. Kneifati's opinions

regarding Plaintiff's exertional, environmental and sit/stand/walk limitations.

Plaintiff further argues that the ALJ erred by finding her "physical impairments

inconsistent with *treatment records* that did not record assessments of Plaintiff's functional

capacity . . . ."  (Pl.'s Br., ECF No. 13, at 7 (emphasis added)).  She maintains that one would not

expect to find such assessments in treatment records.  (*Id.* (citing *Brownawell v. Comm'r of Soc.

Sec.*, 554 F.3d 352, 357 (3d Cir. 2008); *Orn v. Astrue*, 495 F.3d 625, 634 (9th Cir. 2007);

*Leckenby v. Astrue*, 487 F.3d 626, 633 n.7 (8th Cir. 2007))).  In fact, the ALJ found Plaintiff's

treatment records, or "progress notes," inconsistent or unsupported because of her conservative

treatment, as discussed below, whereas he rejected her "examinations" by Dr. Strangarity – such

as the Psychiatric/Psychological Impairment, Fibromyalgia and Multiple Impairment

Questionnaires – on the basis that they "state[d] broadly the claimant's symptoms without providing an assessment of the claimant's functional abilities in relation to the claimant's impairments." (R. 26; *see, e.g.,* R. 258 (in section directing medical provider to "list and discuss" clinical findings, such as mental status examinations or psychological testing, that support the diagnoses and assessment, Dr. Strangarity wrote: "no formal testing performed")). It is well-settled that where such assessments "are unaccompanied by thorough written reports, their reliability is suspect . . . ." *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) (quoting *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986)) (additional citations omitted); *see also Green v. Schweiker*, 749 F.2d 1066, 1071 n.3 (3d Cir. 1984) ("Standing alone, . . . a physical capacities evaluation form is not substantial evidence." (quoting *O'Leary v. Schweiker*, 710 F.2d 1334, 1341 (8th Cir. 1983))); *Parks v. Chater*, No. 94-CV-6897, 1995 U.S. Dist. LEXIS 13068, at *17 (E.D. Pa. June 27, 1995). Accordingly, it was not error for the ALJ to discount this evidence on this basis.

Plaintiff maintains that the ALJ was also wrong to discount Dr. Strangarity's opinions on the basis of her "conservative" treatment consisting primarily of medication prescribed by him, without regular treatment by a rheumatologist, internist, neurologist or other specialist. (Pl.'s Br., ECF No. 13, at 6; R. 26). In support of this assertion, she cites two cases for the proposition that "[s]urgery is never recommended for treatment of fibromyalgia," as well as a third stating than an ALJ "may not impose . . . [his respective] notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered . . . ." (Pl.'s Br., ECF No. 13, at 6 (citing *Lapierre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010); *Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003); quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008))). But the ALJ never suggested that Plaintiff's fibromyalgia was

not disabling due to the fact that she had not pursued surgery.  (R. 15-28).  Further, in both
*Lapeirre-Gutt* and *Brosnahan*, the claimant's course of treatment was significantly more
extensive than in this case.  *See Lapeirre-Gutt*, 382 F. App'x at 664 (noting that the claimant
took "copious amounts of narcotic pain medication as well as occipital nerve blocks and trigger
point injections," "underwent cervical fusion surgery . . . in an attempt to relieve her pain
symptoms," and attended physical therapy – even though it was ineffective and exacerbated her
pain – until her husband could no longer drive her there); *Brosnahan*, 336 F.3d at 673-75 (noting
that, for her fibromyalgia, the claimant had seen an internist, rehabilitation specialist,
psychologist and rheumatologist; took at least two different nonsteroidal anti-inflammatories;
and exercised as a form of physical therapy, as directed by her doctors).

 *Burgess*, moreover, is not a fibromyalgia case, and, in any event, the ALJ in this case did
not merely substitute his own opinion for Dr. Strangarity's on the basis that Plaintiff's
fibromyalgia could not be severe because her treatment for it was not sufficiently "intrusive[ ]."
*See* 537 F.3d at 129.  On the contrary, Plaintiff's treatment limited to pain medication prescribed
by her primary care physician serves as substantial evidence for the ALJ's determination that her
fibromyalgia symptoms were not as severe as alleged by her and Dr. Strangarity.  *See Morales v.
Comm'r of Soc. Sec.*, 799 F. App'x 672, 676-77 (11th Cir. 2020) ("A conservative treatment plan
tends to negate a claim of disability. . . . [The claimant] argues that conservative treatment is
consistent with fibromyalgia. But conservative treatment can support discrediting subjective
symptoms even in cases where, like here, a claimant alleges pain from both fibromyalgia and
other conditions.") (citation omitted); *Horowitz v. Comm'r of Soc. Sec.*, 688 F. App'x 855, 863
(11th Cir. 2017) (per curiam) (conservative treatment for fibromyalgia supported the ALJ's
adverse credibility finding); *Brown v. Comm'r of Soc. Sec.*, 680 F. App'x 822, 826 (11th Cir.

2017) (per curiam) (same).

Additionally, Plaintiff argues that the ALJ erred in concluding that the physical restrictions proffered by Dr. Strangarity conflict with her self-described ADLs. (Pl.'s Br., ECF No. 13, at 7). Dr. Strangarity opined that Plaintiff must avoid literally "all" activities. (R. 265). But substantial evidence supports the ALJ's rejection of this opinion. The ALJ noted that Plaintiff already engages in several relevant ADLs, including attending medical appointments, dining in restaurants, shopping with her daughter-in-law, preparing meals, and dusting. (R. 25-26, 261). Further, the ALJ was justified in concluding that these ADLs conflicted with the specific limitations determined by Dr. Strangarity, such as Plaintiff's purported need to get up from a seated position every 15 minutes for 30 minutes and inability to bilaterally grasp, turn, twist, or otherwise manipulate objects. (R. 26, 266).

Plaintiff complains that instead of crediting the opinions of Dr. Strangarity, the ALJ instead found "mostly persuasive" Dr. Arnold's opinions, even though "it has been the rule for 35 years that opinions from non-examining sources, standing alone, are not substantial evidence in the face of well-supported opinions from treating doctors." (Pl.'s Br., ECF No. 13, at 9 (citing cases from the Third Circuit Court of Appeals)). But, for the reasons set forth above, substantial evidence backs the ALJ's determination that Dr. Strangarity's opinions are not "well-supported." Plaintiff further insists that the ALJ failed pursuant to 20 C.F.R. Sections 404.1520c and 416.920c to "articulate" why he accepted the opinions Dr. Arnold, whom she dismisses as "(1) a non-treating, (2) a non-examining, (3) non-specialist, who (4) reviewed only a small portion of the medical record from the period at issue." (Pl.'s Br., ECF No. 13, at 9). In fact, the ALJ provided several reasons why he credited Dr. Arnold's opinion:

> The exertional limitations and occasional postural limitations as
> stated in this opinion are supported by the record, including the

22

primary care progress notes indicating the claimant's history of limited and conservative treatment for fibromyalgia, primarily consisting of medication management with the primary care provider, the lack of documentation indicating a walker is medically necessary to assist with ambulation, the lack of documentation indicating significant treatment for obesity despite the claimant's body mass index ranging from obese to morbidly obese, and the normal consultative examination findings. For these reasons, the undersigned finds this opinion to be mostly persuasive.

(R. 24).

Accordingly, substantial evidence supports the ALJ's determination regarding the physical limitations in Plaintiff's RFC.  The Court therefore declines to remand this matter on the basis that the ALJ failed to evaluate properly the medical evidence relevant to Plaintiff's physical limitations.

### 2.      Depression and Anxiety

Plaintiff also argues that the ALJ improperly rejected Dr. Strangarity's medical opinions regarding her mental limitations arising from her depression and anxiety on the basis of her mental status examination findings, allegedly conservative treatment, and ADLs.  (Pl.'s Br., ECF No. 13, at 11).  She contends that after examining her Dr. Strangarity made specific findings regarding her depressed mood and affect, lability, sadness and tearfulness, but that the ALJ failed to consider the supportability and consistency of these findings with Dr. Strangarity's opinions, as required by the applicable regulations.  (*Id.* at 11-12).  She further claims that the ALJ erred in dismissing her mental health treatment as conservative simply because it consisted of medication prescribed by her primary care physician.  (*Id.* at 13).  In addition, Plaintiff disputes the ALJ's finding that the mental limitations proffered by Dr. Strangarity are inconsistent with her ADLs. (*Id.* at 14).  She notes that even though the ALJ found partially persuasive the opinions of Dr. Trogner, the psychological consultative examiner, he rejected the mental limitations determined

by her for essentially the same reasons as he rejected those found by Dr. Strangarity.  (*Id.*).

Plaintiff points out that the ALJ instead credited the opinion of Dr. Cannon, a non-examining,

non-treating consultant who based her opinion only on a review of Plaintiff's records.  (*Id.* at

15).

The Commissioner responds that the ALJ correctly concluded that the proffered

limitations were inconsistent with Dr. Strangarity's and Dr. Trogner's "generally normal mental

status examination findings" and that both doctors described her as cooperative, having an

appropriate affect, and/or relating adequately to the examiner, even if both further described her

as sad, depressed and/or tearful.  (Resp., ECF No. 16, at 6).  She also reiterates the ALJ's finding

that Plaintiff's mental health treatment was conservative because it consisted only of medication

prescribed by her primary doctor, as opposed to "inpatient or outpatient psychiatric treatment,

partial hospitalization, psychotherapy, or other significant mental health treatment."  (*Id.* at 7

(quotation omitted)).  Finally, She argues that the ALJ properly concluded that Plaintiff's

purported mental restrictions were inconsistent with Dr. Cannon's findings that Plaintiff would

not require special supervision to sustain a routine and that she could make simple decisions and

execute short, simple instructions.  (*Id.*).

Here, the ALJ found that Plaintiff, mentally, had the RFC to perform simple routine

repetitive tasks and to tolerate occasional interactions with co-workers and supervisors and

occasional change in the work setting, but without any interaction with the public or piece rate

type of work.  (R. 20).  In making this finding, he found unpersuasive Dr. Strangarity's opinion

that Plaintiff would miss more than three days of work per month because of her mental health

impairments and that she has moderate to marked limitations in understanding and memory and

marked limitation in social interactions, adaptation, and concentration and persistence.  (R. 25).

The ALJ cited the following reasons for this conclusion: her normal mental status examination findings; her ADLs, which include watching television, reading, using an iPad, preparing simple meals, going out to eat once per week and socializing with others; and her allegedly limited and conservative mental health treatment consisting only of medication prescribed by her primary care physician, without inpatient or outpatient psychiatric treatment, partial hospitalization, psychotherapy or other similar intervention.  (*Id.*).  For similar reasons, he also found unpersuasive the portion of Dr. Trogner's opinion concluding that Plaintiff has marked limitations in interacting with the public, supervisors, and co-workers and in responding appropriately to usual work situations and to changes in a routine work setting.  (R. 24).

Substantial evidence supports the ALJ's determination regarding the mental limitations in Plaintiff's RFC.  Plaintiff claims that the ALJ failed pursuant to 20 C.F.R. § 404.1520c to evaluate Dr. Strangarity's and Dr. Trogner's opinions based on their findings of depression, anxiety, panic disorder, lability, sadness, tearfulness and attention, concentration, and memory impairments. (Pl.'s Br., ECF No. 13, at 11, 14-15).  She points out that such observational findings are "the gold standard" for evaluation of a patient's mental impairments.  (*Id.* at 12 (citing cases from the United States Supreme Court and Sixth, Seventh, and Tenth Circuit Courts of Appeals)).  However, the ALJ determined that these physicians' opinions were not consistent with "progress notes indicating normal mental status examination findings . . . ."  (R. 24-25).  As he observed, Dr. Strangarity's noted describe Plaintiff as alert, oriented and cooperative.  (R. 19, 22, 276, 302, 307).  She also displayed an "appropriate" mood.  (R. 276, 307).  Plaintiff points out that Dr. Trogner "clearly did a mental exam," apparently to suggest that her opinions should be credited in full, but Plaintiff ignores the complete results of that examination.  (Pl.'s Br., ECF No. 13, at 15).  Although Dr. Trogner also observed many of the same conditions and symptoms

observed by Dr. Strangarity, she further recorded that Plaintiff was able to count down by threes from 20 and state four digits correctly forward and backward, as the ALJ referenced in his decision.  (R. 22, 315-16).  He further observed that Plaintiff's examination revealed that Plaintiff was oriented and cooperative; dressed appropriately; had satisfactory hygiene; demonstrated coherent and goal directed thought process with no evidence of hallucinations, delusions, or paranoia; showed clear sensory abilities; demonstrated only mildly impaired attention, concentration, and memory; evidenced appropriate cognitive functioning; and displayed fair insight and judgment.  (*Id.*).  She also showed the ability to relate to others in a fair manner, maintain appropriate posture and eye contact, and speak fluently and clearly.  (R. 315-16).  Accordingly, substantial evidence supports the ALJ's rejection of the disabling limitations determined by these physicians.

Further, Plaintiff takes issue with the ALJ's description of her mental health treatment consisting of only medication prescribed by her primary care physician, with no inpatient or outpatient psychiatric treatment, partial hospitalization, psychotherapy or other similar mental health treatment, as "conservative and limited."  (R. 24-25).  Plaintiff contends that, "[i]n modern medicine, psychiatric conditions are not ordinarily treated by means other than psychotropic medications, as is the case here."  (Pl.'s Br., ECF No. 13, at 13).  But Plaintiff cites no authority for this proposition and, in fact, the authority she cites suggests that some form of therapy or counseling with a specialist is frequently used as well to treat mental health problems like Plaintiff's.  *Hull*, 2018 WL 3546555, at *10 (treatment for, *inter alia*, depression and anxiety could not be discounted as "conservative" where the plaintiff "was regularly seen by treating psychiatrists and she also went to group and individual therapy"); *Thomas v. Colvin*, No. 15-876, 2016 WL 4537065, at *3 (W.D. Pa. Aug. 30, 2016) (treatment of plaintiff suffering from, *inter*

26

*alia*, mood problems, lack of interest, memory impairment and panic attacks was not limited or conservative where she attended bi-weekly counseling sessions and visited a psychiatrist every one to three months); *Baker v. Astrue*, No. 09-01078, 2010 WL 682263, at *2 (C.D. Cal. Feb. 24, 2010) (noting that the plaintiff, who suffered from depression, attended "months" of psychiatric therapy in addition to taking medication).  Accordingly, the ALJ was correct to consider Plaintiff's proffered mental limitations in light of the limited treatment she has had for her conditions underlying them.[5]  *See Horowitz*, 688 F. App'x at 861-62 (finding that substantial evidence supported the ALJ's decision to discount opinion regarding the allegedly disabling effects of the claimant's mental health impairments where the "conservative and routine" treatment plan consisted only of brief "medication management appointments").

Next, Plaintiff cites the applicable federal regulations and a case from the Seventh Circuit Court of Appeals for the proposition that engaging in ADLs like personal care, shopping, paying bills, living alone, driving a car, dressing appropriately, preparing meals and childcare "do not *necessarily* contradict a finding of disability."  (Pl.'s Br., ECF No. 13, at 14 (quoting 20 C.F.R. Pt. 404, Appendix 1 of Subpart P § 12.00(D)(3)(a) (emphasis added); citing *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008))).  But even if those ADLs do not compel a finding of not disabled, here Plaintiff engaged in additional ADLs, like watching television, reading, using her iPad, going out to eat and in-person socialization.  (R. 25, 45, 47, 231, 316).  Courts in this circuit have found that such activities may be consistent with a finding of not disabled.  *See, e.g., Eich v.*

---

[5]  Plaintiff claims that her "conservative treatment is a non sequitur" as to the ALJ's partial rejection of Dr. Trogner's opinion because "[a] social security consult does not treat . . . ." (Pl.'s Br., ECF No. 13, at 15).  But, as noted, conservative or limited treatment tends to disprove the entire "claim of disability," not simply the treating physician's opinion that the claimant has disabling limitations, because it tends to "discredit[ ]" the severity of the claimant's "subjective symptoms."  *Morales*, 799 F. App'x at 676-77.

*Berryhill*, No. 17-5815, 2018 WL 6061580, at *8 (D.N.J. Nov. 20, 2018) (the claimant watched television, read, played video games, socialized with relatives, and used a computer, email, and Facebook); *Weimer v. Astrue*, No. 02:08-cv-0412, 2009 WL 563932, at *4 (W.D. Pa. Mar. 5, 2009) (the claimant watched television, read the newspaper, socialized with relatives and friends, occasionally dined at restaurants, surfed the internet, and performed household chores and repairs).

Plaintiff complains that instead of crediting the opinions of Dr. Strangarity and Dr. Trogner, the ALJ instead found persuasive the opinion of Dr. Cannon, even though she is, like Dr. Arnold, a "non-treating, non-examining consultant[ ] who reviewed a limited treatment record . . . ." (Pl.'s Br., ECF No. 13, at 15).  She claims that such opinions "are not substantial evidence" in the face of well-supported opinions from treating physicians, especially in the context of mental impairments evaluated primarily based upon observation.[6]  (*Id.*).  However, as discussed in this section, substantial evidence supports the ALJ's determination that Dr. Strangarity's and Dr. Trogner's opinions were not well-supported in light of Plaintiff's normal mental status examination findings, her limited and conservative treatment, and her ADLs. Contrary to Plaintiff's assertions, the ALJ provided his reasoning, in both his rejection, in whole or in part, of their opinions, as well as his crediting of Dr. Cannon's opinion:

> This [Dr. Cannon's] opinion is supported by and consistent with the record, including the claimant's history of mental health treatment consisting of medication management with the primary

---

[6]  Plaintiff also cites an American Psychiatric Association blogpost for the proposition that it is "unethical to offer a professional opinion about an individual without conducting an examination."  (Pl.'s Br., ECF No. 13, at 15).  Her reliance on this nonbinding authority notwithstanding, it is well-settled that "[t]he opinions of state agency consultants . . . warrant significant consideration, in light of their 'expertise in what constitutes disability for social security purposes.'"  *Echevarria v. Colvin*, No. 15-3277, 2016 WL 3457191, at *7 (E.D. Pa. May 31, 2016) (quoting *Packard v. Astrue*, No. 11-7323, 2012 4717890, at *4 (E.D. Pa. Oct. 4, 2012)); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2012).

> care provider, the primary care progress notes indicating normal
> mental status examination findings, and the lack of documentation
> indicating the claimant had mental health counseling other than
> with the primary care provider, inpatient or outpatient psychiatric
> treatment, partial hospitalization, psychotherapy, or other
> significant mental health treatment. Moreover, the claimant
> reported that she watches television, reads, uses the iPad, prepares
> simple meals, goes out to eat weekly, and socializes with others.
> Accordingly, the undersigned finds this opinion to be persuasive.

(R. 23).

Because substantial evidence supports the ALJ's determination of the mental restrictions in Plaintiff's RFC, the Court will not remand this matter on the basis that the ALJ did not properly evaluate the medical evidence regarding Plaintiff's mental restrictions.

### B.    Subjective Statements

As part of an RFC analysis, the ALJ must determine the credibility of a claimant's subjective complaints by evaluating the intensity and persistence of the symptoms to determine the extent to which those symptoms limit the individual's ability to work.  20 C.F.R. §§ 404.1529(c), 416.929(c).  Under Social Security Ruling 16-3p, the ALJ must follow a two-step process in evaluating the plaintiff's subjective symptoms: (1) determine if there is an underlying medically determinable physical or mental impairment, shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the plaintiff's pain or symptoms; then (2) evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the plaintiff's functioning.  SSR 16-3p, 2016 WL 1119029, at *4-8 (Oct. 25, 2017).  In evaluating the intensity, persistence, and limiting effects of a claimant's symptoms, the ALJ must consider relevant factors such as the objective medical evidence, evidence from medical sources, treatment course and effectiveness, daily activities, and consistency of the plaintiff's statements with the other evidence of record.  *Id.*

An ALJ is required to "give serious consideration to a claimant's subjective complaints of pain [or other symptoms], even where those complaints are not supported by objective evidence." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985)).  If the complaints "are not fully credible," the ALJ "has the right, as the fact finder, to reject partially, or even entirely, such subjective complaints . . . ." *Weber v. Massanari*, 156 F. Supp. 2d 475, 485 (E.D. Pa. 2001).  However, "a[n] ALJ must give great weight to a claimant's subjective testimony . . . when this testimony is supported by competent medical evidence." *Schaudeck*, 181 F.3d at 433.

Here, the ALJ noted that Plaintiff reported panic attacks, crying spells, fatigue and problems with sitting, standing, walking, kneeling, bending, squatting, stair climbing, lifting, carrying, reaching, sleeping, talking, completing tasks, remembering, concentrating, focusing, understanding, following instructions and handling stress.  (R. 21, 45, 228-33).  He observed that, according to Plaintiff, she can only sit for 30 minutes at a time and two hours in an eight-hour period, that she can walk only one block with a walker before resting and not walk at all without a walker, and that she requires daily naps and reminders to take medication.  (R. 21, 43-45, 229).  Applying the two-step analysis, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause these alleged symptoms, but that her statements regarding their intensity, persistence and limiting effects were "not entirely consistent" with the medical and other evidence in the record.  (R. 21).  The ALJ reached this determination for essentially the same reasons that he found Drs. Strangarity's, Kneifati's and Trogner's medical opinions unpersuasive or less than fully persuasive, as discussed in the preceding section: Plaintiff's allegedly limited and conservative treatments for her impairments; the results of her physical and mental examinations; and her ADLs.  (R. 22-26).

Plaintiff asserts that the ALJ's conclusions are not supported by substantial evidence and are instead based upon the same flawed reasoning behind his rejection, in part or in full, of the above-noted medical opinions.  (Pl.'s Br., ECF No. 13, at 18).  Specifically, Plaintiff contends that, as set forth in greater detail earlier in her brief, the ALJ erred by mischaracterizing her physical and mental examination results, by finding her treatment too moderate for her symptoms, and by finding her ADLs incompatible with her claimed level of impairment.  (*Id.*).  The Commissioner responds that the ALJ recognized that the record supported some work-related limitations but accounted for them in determining Plaintiff's RFC.  (Resp., ECF No. 16, at 11).  He also reiterates that Plaintiff's treatment was limited and conservative because it consisted primarily of pain and mental health medication prescribed by her primary care provider, that many of her examination results were normal, and that her ADLs supported the ALJ's finding that Plaintiff's physical and mental symptoms are "not as limiting as alleged." (*Id.*).

Substantial evidence exists to support the ALJ's determination that the intensity, persistence and limiting effects of Plaintiff's subjectively reported physical and mental health symptoms were not as severe as alleged, in light of her examination results.  As the ALJ correctly noted, the record shows no documented need for a walker, and Dr. Kneifati's examination revealed that Plaintiff has normal grip strength; strength and reflexes in her extremities; and skin, head, face, ears, nose, throat, neck, chest, lungs, and abdomen.  (R. 26, 324).  In addition, she had stable joints without evident deformity and normal range of motion for her wrists, hands, thumbs, elbows, and hips, and she needed no assistance getting on or off the examination table, could rise from the chair without difficulty, and did not use any assistive devices.  (R. 323, 332-35).  She was also able to fill out a form, tie laces and manipulate zippers

and buttons.  (R. 323).  The ALJ further observed that, mentally, Plaintiff was alert, oriented and cooperative, according to Dr. Strangarity's progress notes.  (R. 19, 22, 276, 302, 307).  The notes additionally indicated that she displayed an "appropriate" mood.  (R. 276, 307).  Moreover, the ALJ remarked that Dr. Trogner's examination showed that Plaintiff could perform simple counting and calculation exercises and that she was oriented and cooperative; dressed appropriately; had satisfactory hygiene; demonstrated coherent and goal directed thought process with no evidence of hallucinations, delusions, or paranoia; showed clear sensory abilities; demonstrated only mildly impaired attention, concentration, and memory; evidenced appropriate cognitive functioning; and displayed fair insight and judgment.  (R. 22, 315-16).  The examination also showed that Plaintiff had the ability to relate to others in a fair manner, maintain appropriate posture and eye contact, and speak fluently and clearly.  (R. 315-16).

Substantial evidence also supports the ALJ's decision to discount Plaintiff's subjective statements on the basis of her limited and conservative treatment for her physical and mental health conditions.  Plaintiff's treatment for her physical impairments consisted of medication prescribed by her primary care physician, without treatment from a rheumatologist, internist, neurologist or other specialist.  (R. 26).  For her mental impairments, she was again prescribed medicine by her primary care physician, without outside counseling, inpatient or outpatient psychiatric treatment, partial hospitalization, psychotherapy, or other significant mental health treatment.  (R. 25).  Such limited and conservative treatment permitted the ALJ to reach an adverse determination as to the credibility of Plaintiff's subjective complaints.  *See Horowitz*, 688 F. App'x at 863; *Brown*, 680 F. App'x at 826.

Lastly, the ALJ's determination that Plaintiff's symptoms are not as severe as alleged given her self-reported ADLs is supported by substantial evidence.  Here, Plaintiff reported not

only tending to her personal care, making sandwiches and cooking, managing her money, feeding her cats, and performing some household chores, but also watching television, playing on her iPad, reading, receiving visitors, attending medical appointments and dining in a restaurant weekly. (R. 25, 228-31, 316).  Thus, the ALJ was justified in determining that Plaintiff is not disabled, notwithstanding her subjective reports and testimony regarding the severity of her symptoms.  *Eich*, 2018 WL 6061580, at *8; *Weimer*, 2009 WL 563932, at *4.

Because substantial evidence supports the ALJ's determination that Plaintiff's subjective statements regarding the severity of her conditions and impairments was not fully credible, the Court will not remand this matter on the basis that the ALJ did not properly evaluate the statements.

## VI.    CONCLUSION

For the reasons set forth above, I find that the ALJ's findings are supported by substantial evidence.  Accordingly, Plaintiff's request for review is **DENIED**.  An appropriate Order follows.

BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge